United States District Court
Southern District of Texas
FILED

SEP 1 2 2022

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas

**ENTERED**

September 13, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| MICHELLE YOLANDA ZAVALA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:21-CV-196 |
| | § | |
| KILOLO KIJAKAZI, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Michelle Yolanda Zavala, proceeding with retained counsel, filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's denial of disability benefits.  Plaintiff's application alleged that she became disabled in 2003 due to a myriad of physical and mental ailments; including bi-polar disorder, major depression, anxiety, suicidal ideations, mood swings, explosive/aggressive behavior, panic attacks, hypertension, high cholesterol, diabetes mellitus type II, hepatitis C, degenerative disc of the lumbar spine, and obesity.  (Tr. 85, 201.)[1]  An Administrative Law Judge (ALJ) found that, while Plaintiff's physical conditions and mental impairments limited her to a restricted range of light work, she is still capable of performing jobs that exist in significant numbers, and thus she is not disabled.

In challenging the Commissioner's denial of benefits, Plaintiff sole claim alleges that the ALJ erred because her "mental RFC determination is not supported by substantial evidence as [s]he failed to properly evaluate the opinion of consultative examiner Mary Elizabeth De Ferreire,

---

[1] The Commissioner has filed a transcript of the record of the administrative proceedings (Docket No. 8), which will be cited as "Tr."  The specific page of the administrative transcript will be cited by reference to the page numbers in bold typeface located in the bottom right corner of the transcript pages.

Ph.D." (Docket No. 13-1, at 1.)  Pending before the Court are the parties' cross motions for summary judgment.  (Docket Nos. 13, 16.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that Plaintiff's claim lacks merit.

The record shows that the ALJ's careful and thorough written opinion shows that she properly considered the medical opinions in the record, including Dr. De Ferreire's opinion.  The record supports the ALJ's findings.  Accordingly, for the reasons discussed further below, it is recommended that Plaintiff's summary judgment motion be denied, that the Commissioner's motion be granted, that the Commissioner's decision be affirmed, and that this action be dismissed.

## I.  BACKGROUND

In November 2018, Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. (*See* Tr. 181.)  In her application, Plaintiff alleged that she became disabled on January 1, 2003; however, she later amended her alleged onset date to June 13, 2013. (Tr. 181, 191.)  She identified bi-polar disorder, major depression, anxiety, suicidal ideations, mood swings, explosive/aggressive behavior, panic attacks, hypertension, high cholesterol, diabetes mellitus type II, hepatitis C, degenerative disc of the lumbar spine, and obesity as the conditions that prevented her from working.  (Tr. 85, 201.)  Plaintiff's application was denied initially and on reconsideration.  (Tr. 99, 115.)  Plaintiff then requested a hearing before an ALJ,

which was held on June 5, 2018. (Tr. 38, 130.) The ALJ issued a written decision on October 14, 2020, finding that Plaintiff was not disabled because she was able to perform a limited range of light work that included jobs existing in significant numbers in the national economy. (Tr. 14-28.)

Plaintiff filed a request with the Social Security Administration's Appeals Council to review the ALJ's adverse decision. (Tr. 177-80.) The Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision for purposes of judicial review. (Tr. 1, 5.) In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[2]

**A.      Education, Work Experience, and Activities**

At the time of the administrative decision, Plaintiff was 52 years old. (*See* Tr. 28, 181.) Plaintiff earned a high school diploma and attended two years of college. (Tr. 202.) Plaintiff's past work experience has varied; however, her most recent employment included working as a "self-employed" housekeeper (2013) and as a "accountant assistant" (2014-2015). (Tr. 224, 231.) As a housekeeper, she "cleaned houses/offices," and as an accountant assistant, she "assisted accountants with payroll and invoices and child support payments for employees." (Tr. 231 (minor errors corrected).) In addition, dating back to 2000, Plaintiff has been employed as a cashier (2000), marketing representative (2001), telephonic outbound sales (2002), cleaning services (2003, 2010, 2011), ticket agent (2004), sales (2007-09), and realty account management (2011-12). (Tr. 224.)

---

[2] The Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). The undersigned has thoroughly reviewed the medical records and other evidence, which will be summarized above.

Plaintiff is married and lives with her husband.  (Tr. 239.)  When she filed her disability application, she described her "illnesses, injuries, or conditions" as follows:

> On a daily basis, I experience mood swings, crying spells, racing thoughts, memory loss, severe anxiety and panic attacks.  I suffer from insomnia, so I go on very little sleep on a daily basis which causes lack of concentration and severe irritability.  I also suffer from lumbar spine disease and a tailbone injury which causes constant pain in lower back when I sit for more than 30 minutes or more a day.  I am unable to lift, bend, sweep and mop which cause severe pain in my lumbar spine and tailbone.  Due to constant pain I experience daily mood swings.  I see insects and people too who are not there.  I'm always scared and [have] suicidal thoughts.

(*Id.* (minor errors corrected).)  Plaintiff is physically able to take care of her activities of daily living, but her attention to "personal care" is minimal due to a lack of motivation.  (Tr. 240.) Plaintiff is only able to sit for 30-minute durations before having to "lay down on [her] side]" to relieve her back pain.  (Tr. 241.)  She is able to prepare "soups, casseroles and box dinners," but it takes her an extended period of time to do so.  (Tr. 242.)  Plaintiff attempts to do housework such as washing dishes, sweeping, and mopping, but it causes her back pain so it can "take 6-8 hours" to complete those tasks.  (*Id.*)

Plaintiff is able to drive a car and goes grocery shopping several times a week.  (Tr. 243.) She also pays her bills and manages her finances.  (*Id.*)  As for her hobbies and interests, she watches television and sports, and listens to music which calms her.  (Tr. 244.)  She spends time with her husband and sees her daughters about twice monthly.  (*Id.*)  She also visits close friends and attends her doctor appointments.  (*Id.*)  However, due to her depression, mood swings, and irritability she "can't stand to be around" people.  (Tr. 245.)

Plaintiff claims that she is limited in ability to lift, squat, bend, sit, and climb stairs.  (*Id.*) Specifically, she is only able to life five (5) pounds or less, she can squat and bend but is unable to get back up.  (*Id.*)  She is able to sit for 30 minutes before the pain starts and can climb 10 steps

4

or less. (*Id.*)  Her ability to walk is limited to two (2) blocks before she will need to take a 30-minute rest break. (*Id.*)

Plaintiff also asserts that her memory and ability to concentrate are limited, and she has difficulty getting along with others. (*Id.*)  She has difficulty handling stress. (Tr. 246.)  As to her mental conditions that limit her ability to work, Plaintiff experiences panic attacks and anxiety. (*Id.*)  She also experiences visual hallucinations, paranoia, and racing thoughts. (*Id.*)  According to Plaintiff, she has "been suffering with [her] illnesses for 15+ years now"; however, in the last three years, her illnesses have worsened.[3]  (Tr. 247.)

**B.     The Medical Evidence**

Plaintiff's medical records date back to 2004.  (*See* Tr. 326-31.)  Although Plaintiff originally alleged that her onset disability date was in 2003, she did not file for disability benefits until November 2018, and she now alleges that she has been unable to work since June 2013.  In addition, Plaintiff is not challenging the ALJ's decision as it relates to her physical ailments.  As such, this summary of the medical evidence will focus on those impairments that are relevant to Plaintiff's application for disability benefits and, more specifically, to those impairments that are most relevant to her alleged sole point of error.

1.     Mental Health Issues

Plaintiff's mental health records date back to 2004, when she received a mental health evaluation while incarcerated.  (*See* Tr. 326-31.)  At that time, Plaintiff complained of difficulty sleeping, mania, anxiety, depression, and loss of appetite.  (Tr. 330.)  Apparently, these mental

---

[3] Plaintiff's husband, Esteban R. Zavala, Jr., filed a "Function Report – Adult – Third Party," which is largely consistent with the "Function Report" that was filed by Plaintiff. (*Compare* Tr. 239-47, *with* Tr. 248-55.)

health issues persisted and dating as far back as 2005, Plaintiff has been diagnosed with "Bipolar D/O Mixed, Severe."[4]  (Tr. 336.)

As far back as 2006, Plaintiff has relied upon Tropical Texas Center for MHMR ("TTC") for her mental health treatment.[5]  (*See* Tr. 432.)  In fact, since 2006, Plaintiff has visited TTC on more than 30 occasions.  (*See* Tr. 432-585, 694-797.)  Plaintiff has been consistently diagnosed with bipolar disorder and depression, among other things.  (*See* Tr. 432, 436, 442, 446, 452, 454, 482, 527, 533, 560, 697.)  In addition, to help manage her mental health issues, Plaintiff has been prescribed Invega, Alprazolam, Lamictal, Prozac, Buspar, Trazadone, Depakote, and Hydroxyzine.[6]

Although Plaintiff has repeatedly presented to TTC, the record shows that she has been inconsistent with her mental health treatment.  In fact, Plaintiff has at times refused medications and has stopped and re-started her treatment repeatedly.[7]  Nevertheless, TTC has adjusted Plaintiff's treatment plan as needed.[8]  In addition, Plaintiff's symptoms have decreased and increased in severity; according to her subjective complaints.[9]

---

[4] According to Plaintiff, she is currently prescribed and taking Ambien, quetiapine, trazodone, buspirone, prazosin, alprazolam, and hydroxyzine for her mental health issues.  (Tr. 51, 307, 317.)

[5] In summarizing the medical evidence, the ALJ refers to this facility as "Tropical Texas Behavioral Health."  (*See* Tr. 20-22.)

[6] (*See* Tr. 307, 317, 471, 477, 500-01, 514-15, 528, 540, 579-85, 616, 713, 726-27, 733, 737, 749, 755, 762, 768, 781, 786, 796-97.)

[7] (*See* Tr. 345, 463, 467, 469, 475, 489, 495, 509, 533, 538, 545, 554, 556, 560, 573, 603, 697, 712, 726, 733, 749, 762, 769, 776 780.)

[8] The record shows that TTC has consistently adjusted Plaintiff's medications as needed and based on her subjective complains.  (*See* Tr. 528, 613, 616, 698, 713, 727, 749, 755, 768.)

[9] Plaintiff has repeatedly presented to TTC in a cooperative manner, exhibiting general positive hygiene, and in a stable state of mind.  (*See* Tr. 346, 458, 470, 475, 487, 493, 501, 505, 507, 515, 519, 524, 525, 532, 543, 610, 613, 615, 619-20, 719, 772, 780.)

On March 12, 2019, Plaintiff presented to Mary Elizabeth De Ferreire, Ph.D., at the International & Multicultural Psychological Services center for a "Clinical Interview w/Mental Status Exam for Disability." (Tr. 592-601.)  The ALJ summarized this visit as follows:[10]

> The claimant attended a psychology consultative examination (CE) in March 2019. The mental status examination showed that she was casually dressed, but her grooming was inadequate due to her disheveled hair (Ex. B10F/5). Despite of this, the examiner observed her hygiene was "adequate." Moreover, the mental status examination showed that her speech was 100% intelligible and thought process was coherent, logical, and goal directed (Ex. B10F/6). It also showed no current suicidal ideations or hallucinations. The claimant's memory skills were intact, because she was able to name 3 US presidents and recall 4 words after 5 minutes (Ex. B10F/8). She was also able to complete a simple arithmetic problem. Thus, her concentration was intact as well. As such, the undersigned finds that she can understand, remember, and carry out instructions and perform tasks with a reasoning, math, and language development level 2.

(Tr. 21.)  Although not dispositive, the ALJ's treatment of Dr. De Ferreire's medical findings are instructive.  Plaintiff drove herself to the appointment with Dr. De Ferreire.  (Tr. 592.)  Plaintiff's general hygiene was "adequate, but "[h]er grooming was inadequate as evidence by uncombed hair." (Tr. 592, 596.)  She also exhibited an "impaired . . . and slow gait due to lower back pain." (Tr. 592, 596 ("slow awkward gait").)  Although she was not "agitated," she began crying at the beginning of the interview.  (Tr. 593, 598 ("intermittently crying").)

As to her activities of daily living, Plaintiff "does not have a need for supervision" and she "is able to care for her personal needs like bathing, dressing, going to the restroom, brushing her teeth, and grooming." (Tr. 593.)  She is also able to prepare meals, handle her finances, shop for groceries, and she "does deal with change." (*Id.*)  Plaintiff "gets along" with family members, has friends, and "get[s] along with people of authority." (Tr. 594.)  She can "complete tasks at home" but has been "terminated from employment from several jobs" based on her "failure to show up

---

[10] Plaintiff also provided a detailed summary of Dr. De Ferreire's medical opinion, which the undersigned found helpful.  (Docket No. 13-1, at 4-5.)

due to symptoms." (*Id.*)  She also described her history of drug abuse and personal trauma.  (Tr. 595.)

Plaintiff displayed "a positive attitude to both testing and interview," she was "cooperative" and she "maintained eye contact." (Tr. 596.)  Her "speech [was] normal," and her "thought process was noted to be coherent, logical, and goal directed."  (Tr. 597.)  She described having multiple "current phobias," "past suicidal ideation/plans," and "past hallucinations."  (*Id.*)  Plaintiff described her feelings of anger (as exhibited by road rage), depression, and anxiety as "moderate." (Tr. 598.)  She "demonstrated appropriate affect" and she "was alert and oriented (x 5) except to date."  (*Id.*)  Dr. De Ferreire determined that Plaintiff's "immediate," "short-term," "long-term," and "remote memory skills were [all] intact."  (Tr. 599.)  In addition, her "concentration skills" and "judgment" were intact, but her "insight was noted to be impaired."  (*Id.*)

Ultimately, Dr. De Ferreire diagnosed Plaintiff with "posttraumatic stress disorder, chronic," "other problem related to employment," and "persistent depressive disorder, chronic," and she noted that Plaintiff's prognosis was "poor." (*Id.*)  Dr. De Ferreire assessed her functional capacity as follows:

> [Plaintiff's] mental capacity was impaired due to depression and trauma symptoms. [She] will be unable to carry out simple/complex step instructions if has to walk stand or sit for long. [Plaintiff] will be able to sustain concentration at a reasonable pace due to as she did for this evaluation, albeit was on a one-to-one basis. [She] will be unable to be socially active with others as she has no friends. [Plaintiff] will be unable to deal with normal pressures of competitive work setting due to many medical conditions interfering with stable functioning.

(Tr. 599.)

On May 6, 2019, a state agency medical expert, Jean Germain, Ph.D., reviewed Plaintiff's medical records and performed a mental RFC assessment.  (Tr. 89-98.)  Dr. Germain acknowledged Plaintiff's history of depression, anxiety, obsessive compulsive disorder, and

suicidal ideations, but determined that she "is maximally able to understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting." (Tr. 96.) As such, he determined Plaintiff's "alleged limitations [were] not fully supported by the" medical evidence of record. (Tr. 94 (allegations "are partially consistent"), 96.)

On July 17, 2019, another state agency medical expert, Julian Lev, Ph.D., reviewed Plaintiff's medical records, and likewise found Plaintiff's allegations "partially consistent." (Tr. 106-14.) Dr. Lev's findings were largely consistent with Dr. Germain's. (*Compare* Tr. 94-96, *with* Tr. 110-12.) Ultimately, Dr. Lev's mental RFC assessment by was a bit more restrictive than Dr. Germain's. (Tr. 102, 107.) Dr. Lev determined that Plaintiff "would be able to complete simple tasks in a low stress work environment that requires no more than occasional, task related contact with others." (Tr. 112.)

2.      Other Physical Ailments

As noted, Plaintiff alleges that the physical ailments that prevent her from working include hypertension, high cholesterol, diabetes mellitus type II, hepatitis C, degenerative disc of the lumbar spine, and obesity.[11] (Tr. 85, 201.) However, she does not challenge the ALJ's decision denying her disability benefits as it relates to her physical ailments. In any event, they will be briefly summarized.

While it is unclear when Plaintiff was diagnosed with hepatitis C, she received treatment for it at Doctors Hospital at Renaissance as early as August of 2012. (*See* Tr. 395, 677 ("20+ year

---

[11] According to Plaintiff, she is currently prescribed and taking amlodipine and lisinopril for hypertension, pioglitazone for diabetes, naproxen, cyclobenzaprine, codeine, and tramadol for back pain. (Tr. 307, 317.) Codeine (Tylenol 4s) and tramadol are prescribed to Plaintiff's husband, but she takes them as needed. (*See* Tr. 53, 307, 317.)

history"), 670, 675.) Due to her hepatitis, she also underwent a "liver biopsy" in February of 2013. (Tr. 663 ("Liver Biopsy" due to "Chronic Hep C").) She continued to receive treatment there for hepatitis in April and May of 2013, often complaining of abdominal pain. (Tr. 646, 649, 652, 659.) As to her hepatitis, her "level of risk is minimal," even though at times she required "moderate to high severity care." (Tr. 648.)

Plaintiff's back issues appear to originate from a fall she suffered on December 6, 2014. (Tr. 351.) She presented to Khit Chiropract and Wellness on December 12, 2014, for treatment. Due to the fall, she experienced "sharp" and "constant" pain in her lumbar, sacroiliac, and buttock regions. (*Id.*) She complained that her symptoms were worsening and that the pain resulted in a "serious diminution in her capacity to carry out daily activities." (*Id.*) Upon examination, Plaintiff's "walk revealed no antalgic gait"; however, she exhibited "significant decrease of normal range of motion" with lumbar flexion, extension, right and left rotation, "with associated pain, spasms and discomfort. (Tr. 352.) Plaintiff's prognosis was assessed to be "fair," but "due to the severity of the injury," "permanent residuals [were] probable." (Tr. 353.) Jason Longoria, D.C., prescribed Plaintiff "hot moist pack[s]" for treatment. (Tr. 353-54.)

Plaintiff returned to Khit Chiropractic and Wellness frequently over the next several months seeking continued treatment for her lower back. (Tr. 351-91.) Although her lower back pain persisted, she at times reported that the pain had improved. (Tr. 361, 379, 389 ("the symptoms have generally been improving slightly").) On December 18, 2014, and x-ray of her lower back showed "degenerative changes" in her L1-L5 regions. (Tr. 360.) Dr. Longoria noted that Plaintiff "has been inconsistent when following our recommendation for care" and stressed that her prognosis "may well change and is directly dependent on how well the treatment plan is followed." (Tr. 353, 362, 380, 390.) Plaintiff's back issues persist. (*See* Tr. 52-53.) On August 14, 2019, an

10

X-ray of her "spine lumbosacral" region showed "[m]ild compression deformity of the anterior L2 body and Schmorl's node," as well as "[m]ultilevel degenerative disc disease." (Tr. 636, 639.)

Next, Plaintiff has a history of obesity. (Tr. 18, 54-55, 396, 402, 596, 633, 678, 723, 740.) Regardless of her obesity, she ambulates "normally," has a "normal gait," and "walks without restrictions." (Tr. 402-03, 635, 678-79.) In fact, Plaintiff's obesity did not appear to have an impact on her general functioning. (*See* Tr. 18, 352, 361, 379, 389 ("Her walk revealed no antalgic gait."); *but see* Tr. 596 ("awkward gait" and presence of obesity).) Plaintiff "was able to sit, stand, move about, and transfer" without the "need [for] assistive devices." (Tr. 634.)

In addition, the medical evidence of record also evidences Plaintiff's physical ailments of diabetes, hypertension, and high cholesterol. (*See* Tr. 397, 401, 403, 603-07, 679, 682-83, 701, 764, 782, 790, 799, 812.) Here again, Plaintiff has exhibited a history of non-compliance with treatment. (*See* Tr. 603.) In any event, the ALJ determined that they were "not severe impairments." (Tr. 17.)

## C.    The Evidentiary Hearing

The ALJ held the evidentiary hearing on August 25, 2020.[12] (Tr. 38-62.) Two witnesses testified: Plaintiff and a vocational expert, Eligio Hinojosa.[13] Plaintiff was represented at the hearing by one of her attorneys, Brandon Griffin.[14] She was 52 years old at the time of the hearing. (Tr. 46.) Mr. Griffin made a brief opening statement, in which he highlighted Plaintiff's

---

[12] "Due to the extraordinary circumstance presented by the COVID-19 pandemic," the hearing was conducted "over the phone." (Tr. 40.) Plaintiff had no objection to the hearing being held telephonically. (Tr. 41.)

[13] Mr. Hinojosa is a "vocational rehabilitation counselor." (Tr. 59.)

[14] Throughout her proceedings, Plaintiff has been represented by several attorneys; including Jason K. Baril and Melissa A. Palmer.

11

impairments.[15] He stressed that Plaintiff's "mental health impairments [alone] and the symptoms that she's been suffering from should be enough in itself to where she cannot sustain full-time work." (Tr. 43.) He explained that her mental health impairments included "symptoms of anxiety, depression, despair, poor personal hygiene, mood swings, paranoia, racing thoughts, crying spells," as well as hallucinations. (*Id.*) In addition, Mr. Griffin explained that her "physical issues" include lower back pain, "reduced range of motion in her back," "multilevel degenerative disc disease [ ] and mild compression deformity," impaired gait, diabetes, and numbness in her feet. (Tr. 44-45.)

Prior to questioning by Mr. Griffin, the ALJ briefly discussed with Plaintiff her work history, which was largely consistent with her disclosures in her "Work History Report." (*Compare* Tr. 45-47, *with* Tr. 224, 231.) In response to questioning from her attorney, Plaintiff stated that "the number one problem that [she has] suffered from that made it difficult for [her] to work a full-time job" is her "mental health issues." (Tr. 47.) In fact, Plaintiff summarized her "symptoms of depression that makes it difficult for [her] to work" as follows:

> I suffer from crying spells on a daily basis, anxiety, panic attacks, insomnia. There are days I don't – I'll go two or three hours of sleep only. I have racing thoughts. Irritability, mood swings, I isolate myself, and depressed. I don't want to associate with anybody. Especially with my mood swings, nobody can even be around me. And that's a constant battle for me. I don't have no motivation whatsoever to get out of bed or to shower or to take care of myself or to take care of my husband.

(Tr. 47-48.) Plaintiff has difficulty communicating with the husband, they sleep in separate rooms, and she doesn't "want to be around anybody," including him. (Tr. 48.)

---

[15] Although at the beginning of the hearing Mr. Griffin confirmed that the administrative record was complete, he noted that Plaintiff "would likely have to amend the alleged onset date." (Tr. 41-42.) Mr. Griffin stated that now "[i]t's going to be at least [2015]." (Tr. 42.) In addition, in questioning Plaintiff Mr. Griffin explained to her that they were going to focus on the time-period including June 2018 to the time of the hearing. (Tr. 47, 52.)

She explained that the "mental health medications" that she is taking cause her side-effects, including dizziness, slurred speech, sedation, a general feeling of numbness, and the inability to function or "think clearly." (Tr. 49.) Despite these side-effects, she takes her medication as prescribed. (*Id.*) In addition, Plaintiff receives mental health counseling once a month, although she feels some psychiatrists are more effective at treating her than others. (Tr. 49-50.) Plaintiff testified that some days are worse than others, and in a typical week, she locks herself in her bedroom, neglecting her personal hygiene "three to four times." (Tr. 50.)

Plaintiff also described her hallucinations, which occur on a "daily basis." (Tr. 51.) She sees "insects all over," including on her phone and by the bed. (*Id.*) The insects that she sees include "roaches or spiders or ants," which is "extremely scary." (*Id.*) Recently she has also been experiencing nightmares which make it difficult to sleep. (*Id.*) To help her sleep patterns, Plaintiff has been taking Ambien and Prazosin, which provide her some relief. (*Id.*)

As to her physical ailments, Plaintiff described her lower back pain "daily [and] constant." (Tr. 52.) She stated that if she sits "down long enough, longer than 30 minutes, or standing, [or does] any kind of light work, it's a throbbing, sharp pain." (Tr. 52.) She also feels grinding or popping in her lower back. (*Id.*) The pain travels down her right leg "all the way down to [her] calf." (*Id.*) As for medication, she is unable to take "narcotics" for her back pain, so she has been prescribed Allegra which is "for inflammation and for pain." (Tr. 53.) In addition, in "[e]xtreme [pain] situations," she will take her husband's "Tylenol 4s or the Tramadol." (*Id.*) She also uses a heating pad. (*Id.*)

As to her physical abilities, Plaintiff testified that she is only able to "stand in place . . . [m]aybe 30 minutes at most" before she feels "the sharp, throbbing pains in [her] back [and] numbness in her feet." (Tr. 54.) She is only able to walk "[l]ess than two blocks" before taking a

break. (*Id.*) She is unable to exercise, which has led to her obesity. (Tr. 54-55.) Plaintiff also stated that she does her grocery shopping "curbside" now because she "can't be around people" and also experiences "road rage." (Tr. 55.) If she has "to go into a store, it's going to be right when they're going to close, when nobody is there." (*Id.*)

The vocational expert, Mr. Hinojosa, testified that Plaintiff's prior work as a housekeeper would be considered at a medium exertional level, and her prior work as a telephone solicitor would be considered at a sedentary exertional level. (Tr. 56.) The ALJ asked the following hypothetical:

> Let's start with a younger individual with a high school education and past work as you've described with a residual functional capacity to perform work at all exertional levels except that the individual can occasionally climb ramps and stairs, but never climb ropes, ladders, scaffolds, or climb ladders.
> The individual can perform tasks that never require exposure to hazards such as machinery that requires agility to evade, machinery with exposed moving parts that could engage the body, and unprotected heights.
> The individual can understand, remember, and carry out instructions and perform tasks with a reasoning, math, and language development level 2 working with objects and data rather than with people in a goal-oriented setting rather than one that requires that a consistent pace be maintained throughout the workday.
> The individual can communicate and interact occasionally with supervisors and coworkers, but never with the public. The individual can adapt to occasional changes in a routine work environment. Is there work that such an individual can perform? Or I should say, can the individual perform any of the claimant's past work?

(Tr. 56.) Mr. Hinojosa responded "[n]o, Your Honor." (*Id.*) Mr. Hinojosa was asked "is there work that such an individual can perform"? (*Id.*) The VE identified the following three jobs:

1)     Laundry Worker: 100,000 jobs available nationally;

2)     Hospital Cleaner: 400,000 jobs available nationally; and

3)     Hand Packager: 173,000 jobs available nationally.

(Tr. 57.)

For the second hypothetical, the ALJ asked Mr. Hinojosa to assume "the same as the first "except that the individual can perform light work[, and] [t]he individual can occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs, but never climb ropes, ladders, or scaffolds." (*Id.*) The second hypothetical included "the same hazard limitations and mental limitations" as the first. (*Id.*) Mr. Hinojosa stated that this individual could perform the following three jobs:

    1)    Garment Sorter: 234,000 jobs available nationally;

    2)    Boot/Shoe Sorter: 135,000 jobs available nationally; and

    3)    Small Products Assembler: 200,000 jobs available nationally.

(Tr. 58.)

Next, the ALJ imagined an individual with the same limitations as in the first hypothetical, except that "[e]ven with occasional changes, the individual cannot successfully complete assigned tasks without exhibiting crying spells, irritability, verbal aggression, and insubordination at unpredictable times and unpredictable duration." (*Id.*) The VE responded, "[n]o, Your Honor, this individual will not be able to maintain competitive employment." (*Id.*) The ALJ continued, the fourth hypothetical "is the same as number one, but the individual is expected to be absent for all or part of a workday on a recurring average of two days per month without advance notice of approval." (Tr. 58-59.) Here again, the VE responded, "[n]o, Your Honor, this individual will not be able to maintain competitive employment." (Tr. 59.)

Finally, the ALJ stated that the "fifth hypothetical is the same as the second, but the individual requires the opportunity to alternate between sitting and standing or walking every hour without ceasing work activity." (*Id.*) Mr. Hinojosa responded that this person could still perform the jobs of garment sorter, boot/shoe sorter, and small products assembler. (*Id.*)

Plaintiff's attorney, Mr. Griffin declined to question Mr. Hinojosa, but he made a brief closing statement. (Tr. 59-60.) Mr. Griffin stated that he "certainly agree[d] with especially the third hypothetical." (Tr. 60.) He also reiterated his desire to "adjust the onset date" to a day that "would support [the] third hypothetical." (*Id.*)

**D.      The ALJ's Decision**

The ALJ issued a thorough written decision, consisting of fifteen pages of single-spaced type. (Tr. 14-28.) In making her decision, the ALJ applied the five-step method for evaluating disability claims.[16]

The ALJ first found (at Step One) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability, June 13, 2013. (Tr. 16.) In considering the severity of Plaintiff's impairments (Step Two), the ALJ determined that Plaintiff had the following "severe" medical impairments: "compression deformity of anterior L2 body and Schmorl's node, lumbar degenerative disc disorder, hepatitis C, obesity, bipolar I disorder, alcohol use disorder, and cannabis use disorder (20 CFR 404.1520(c))."[17] (Tr. 17.) In making these determinations, the ALJ summarized the medical evidence of record (which was detailed, thorough, and exhaustive). (Tr. 17-26.)

The ALJ also found that Plaintiff's impairments were not severe enough, singly or collectively, to meet or medically equal one of the listed impairments in the regulations (Step Three). (Tr. 17.) In reaching this conclusion, the ALJ analyzed listings addressing Plaintiff's

---

[16] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section of this report, *infra* Part II.A.

[17] The ALJ also found that although Plaintiff "alleges she suffers from <u>diabetes</u>, <u>hypertension</u>, and <u>hyperlipidemia</u>," . . . "these medically determinable impairments do not significantly limit [her] ability to perform basic work activities as required by SSR 85-28." (Tr. 17 (emphasis in original).)

various physical conditions. (Tr. 17-19.) Specifically, the ALJ performed a detailed assessment of "listing 1.04 in regards to [Plaintiff's] compression deformity of anterior L2 body and Schmorl's node and lumbar degenerative disc disorder," hepatitis C as it relates to "the requirements in 5.05 for chronic liver disease," and obesity "as required by Social Security Ruling 19-02p." (Tr. 17-18.)

The ALJ also determined that the "severity of [Plaintiff's] mental impairment of bipolar I disorder considered singly and in combination did not meet or medically equal the criteria of listing 12.04 (which includes the "paragraph B and paragraph C" criteria). (Tr. 18-19.) In making this finding, the ALJ determined that Plaintiff had "moderate limitation" in the following paragraph B criteria: 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; and 4) adapting or managing oneself. (*Id.*) "Because [Plaintiff's] mental impairments did not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria were not satisfied."[18] (Tr. 19.)

The ALJ next assessed Plaintiff's residual functional capacity (RFC) to do physical and mental work activities. The ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that, through the date of last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant can balance, stoop, kneel, crouch, crawl, and climb ramps and stairs occasionally; but, never climb ropes, ladders, or scaffolds. The claimant can perform tasks that never require exposure to hazards, such as machinery that requires agility to evade or to unprotected heights. The claimant can understand, remember, and carry out instructions, and perform tasks with a reasoning, math, and language development level 2; working with objects and data rather than with people; in a goal-oriented setting rather than one that requires a consistent pace be maintained throughout the workday. The claimant can adapt to occasional changes in a routine work environment.

---

[18] The ALJ also determined that Plaintiff's substance abuse issues "are not a contributing factor material to a finding that [she] is disabled." (Tr. 19.)

17

(Tr. 19.)  In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (*Id.*)

In considering Plaintiff's symptoms, the ALJ followed the two-step process required by the regulations.  First, she considered "whether there is an underlying medically determinable physical or mental impairment(s) ... that could reasonably be expected to produce the claimant's pain or other symptoms." (*Id.*)  In addressing this inquiry, the ALJ provided a detailed summary of the medical evidence in the record.[19]  (Tr. 20-26.)  After assessing the evidence regarding Plaintiff's impairments, the second step of the analysis required the ALJ to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (Tr. 20.)  In performing this evaluation, the ALJ was required to make a finding on the credibility of Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms." (*Id.*)

Ultimately, the ALJ found that Plaintiff suffered from numerous "medically determinable impairments . . . however, the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 20, 24 ("As for [Plaintiff's] statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the medical evidence fails to substantiate the asserted limitations.").)  The ALJ explained that the evidence "fails to support a finding that these conditions have functionally restricted the claimant to a level

---

[19] In addition, the ALJ summarized and considered Plaintiff's testimony at the evidentiary hearing. (Tr. 20.)

incompatible with sustained work activity within the limitations of the assessed residual functional capacity." (Tr. 24.)

The ALJ also considered the medical opinion evidence. (Tr. 25-26.)  In doing this, the ALJ noted that she "cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources."[20] (Tr. 25.)  The ALJ began by evaluating the opinions of Patty Rowley, M.D., and Craig Billinghurst, M.D., the two state agency medical consultants (SAMC).  (Tr. 25.) She found that Drs. Rowley and Billinghurst's "opined that [Plaintiff's] diabetes was not a severe impairment," that their opinions were "consistent with treatment notes and supported by the evidence," and therefore, their opinions were "persuasive." (*Id.*)

As to Jean Germain, Ph.D., the ALJ found that her determination that Plaintiff was "maximally able to understand, remember, carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings" was "persuasive" because "it was consistent" and "supported" by the medical evidence. (*Id.*)  On the other hand, the ALJ found that Dr. Julian Lev, Ph.D.'s opinion that Plaintiff "was able to complete simple tasks in a low stress work environment that required no more than occasional and task related contact with others" was "unpersuasive" because it was "inconsistent" and "not supported" by the medical evidence." (*Id.*)

In addition, the ALJ considered the opinion of Mary E. De Ferreire, Ph.D., the psychology consultative examiner. (*Id.*)  To begin with, the ALJ determined that Dr. De Ferreire's opinion that Plaintiff "was able to manage benefit payments in her own interest and understand the meaning

---

[20] The ALJ also noted that she "has fully considered the medical opinions and prior administrative medical findings" in the record. (Tr. 25.)

of filing for benefits" was "persuasive [ ] because [it] was supported by her abilities to concentrate and memorize information." (*Id.*) However, as to Dr. De Ferreire's opinion that Plaintiff was "unable to carry out simple and complex step instructions, if she had to walk, stand, and sit for a long time; socialize; and deal with normal pressures of a competitive work setting"; the ALJ found "them unpersuasive, because they are inconsistent" the medical evidence of record. (*Id.*)

Finally, in regard to Plaintiff's back conditions, the ALJ found that Dr. Dionisio Calvo's opinion that Plaintiff had only "mild" restrictions walking and standing and "no restrictions sitting and carrying objects" were "not supported" and "inconsistent" with the medical evidence, and therefore, she found the opinion "unpersuasive." (Tr. 25-26.) "In sum, [the ALJ found that] the objective medical evidence provides strong support for the residual functional capacity" that Plaintiff maintained. (Tr. 26.)

Next, the ALJ found that Plaintiff "is unable to perform any past relevant work" (Step Four). (Tr. 26.) In considering whether Plaintiff could perform any other jobs in the national economy (Step Five), the ALJ relied on the testimony of the vocational expert, Mr. Hinojosa. In particular, Mr. Hinojosa opined that given the ALJ's RFC finding, Plaintiff could perform several other jobs, including a garment sorter, boot/shoe sorter, and a small products assembler. (Tr. 26-27.) From this, the ALJ concluded that Plaintiff is not disabled.

**E.      Procedural History**

Plaintiff sought administrative review of the ALJ's decision. The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review. The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1.) Pending are the parties

cross-motions for summary judgment.  (Docket Nos. 13, 16.)  The issues have been briefed by the

parties and will be analyzed in light of the applicable standard of review.

## II.  ANALYSIS

### A.    Standard of Review

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden

of proving that she is disabled.  42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered

to be under a disability unless he furnishes such medical and other evidence of the existence thereof

as the Commissioner of Social Security may require."); *see also Fraga v. Bowen*, 810 F.3d 1296,

1301 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983)).  The Act defines

disability as the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is defined as

"an impairment that results from anatomical, physiological, or psychological abnormalities which

are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at §§

423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the

Commissioner applies the following five-step inquiry:

(1)   whether the claimant is currently working in substantial gainful
employment;

(2)   whether the claimant suffers from a severe impairment;

(3)   whether the claimant's severe impairment is sufficient under the pertinent
regulations to support a finding of disability;

(4)   whether the claimant is capable of returning to his or her past relevant work;
and, if not,

21

(5) whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At Steps One through Four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at Step Five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although the burden is initially on the Commissioner at Step Five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant could perform. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "Throughout the process, the ultimate burden of establishing disability remains with the claimant." *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at Step Four that Plaintiff was unable to perform her past relevant work. At Step Five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because she could perform jobs existing in significant numbers in the national economy. In light of this evidence that Plaintiff could perform other work, the ultimate burden of proof remained with the Plaintiff.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Masterson*, 309 F.3d at 272.

Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Evidentiary conflicts are for the Commissioner to resolve, not the courts. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.    Issue**

In seeking review of the Commissioner's denial of benefits, Plaintiff alleges that the ALJ committed reversible error in a single claim; specifically, that "[t]he ALJ's mental RFC determination is not supported by substantial evidence as [s]he failed to properly evaluate the opinion of consultative examiner Mary Elizabeth De Ferreire, Ph.D." (Docket No. 13, at 1; Docket No. 13-1, at 2, 9.) The Commissioner argues that the ALJ did not commit reversible error because "[s]ubstantial evidence supports the mental limitations contained in the ALJ's residual functional capacity (RF) assessment"; and, as such, the Commissioner should be granted summary judgment on this issue. (Docket No. 16, at 1, 6-9.)

**C.    Dr. De Ferreire's Medical Opinion**

As noted, Plaintiff's sole claim is that the ALJ committed reversible error because her "mental RFC determination is not supported by substantial evidence as [s]he failed to properly

evaluate the opinion of consultative examiner Mary Elizabeth De Ferreire, Ph.D." (Docket No. 13, at 1; Docket No. 13-1, at 2, 9.) Specifically, Plaintiff alleges that "the ALJ's evaluation of was contrary to the regulations and caselaw" because Dr. De Ferreire's opinion is both consistent with and supported by the medical evidence of record. (Docket No. 13-1, at 11-15.) Essentially, Plaintiff argues that the ALJ erred by failing to properly apply the supportability and consistency factors.

"[F]ederal regulations require ALJs to assign each medical opinion a weight and explain the reasons for that weight." *Winston v. Berryhill*, 755 F. App'x 395, 402 (5th Cir. 2018). "After [Plaintiff's] claim was filed, the Social Security Administration changed its regulations so that ALJs are no longer required to assign each medical opinion a weight: 'For claims filed on or after March 27, 2017 ... [w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)....'" 20 C.F.R. § 404.1520c(a). *Winston*, 755 F. App'x at 402 n.4. One court has explained how the new regulations apply to medical opinions as follows:[21]

> Since [Plaintiff] filed for SSI and DIB "on or after March 27, 2017," the ALJ was required to apply the new regulations. 20 C.F.R. § 404.1520c. Through the new regulations, the Administration revised the procedures and standards for evaluating medical opinions and prior administrative medical findings, abrogating the treating physician rule. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c(a). As such, ALJs are "no longer required to give controlling weight" to the opinions of treating physicians. *See, e.g., Pearson v. Commissioner*, No. 20–CV–3030 (AMD), 2021 WL 3373132, at *4–*5 (E.D.N.Y. Aug. 3, 2021). Instead, the ALJ considers the persuasiveness of medical opinions from different medical sources. 20 C.F.R. § 404.1520c(b)(2). In evaluating persuasiveness, the ALJ considers five factors: (i) supportability; (ii) consistency; (iii) the source's relationship with the patient; (iv) the source's specialty; and (v) "other factors that tend to support or contradict" the opinion. 20 C.F.R. § 404.1520c(c). The most important factors in evaluating persuasiveness are

---

[21] The parties also explained how the new regulations apply to the treatment that the ALJ should afford to medical opinions in the record. (Docket No. 13-1, at 10; Docket No. 16, at 6-7.)

supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). In considering these factors, the ALJ is required to "*explain how* [h]e considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [Plaintiff's] determination or decision." *Id.* (emphasis added).

With respect to "supportability," "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." *Vellone v. Saul*, 1:20–CV–00261–RAK–HP, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1)). *See also* Revision to Rules, 82 Fed. Reg. at 5853. The regulations provide that "consistency" is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2)). *See also* Revision to Rules, 82 Fed. Reg. at 5853.

Considering the newness of the regulations, there is a dearth of caselaw concerning what constitutes a sufficient "explanation" of supportability and consistency under 20 C.F.R. § 404.1520c(b)(2). *See, e.g., Moore v. Saul*, No. 3:20–CV–48–DPJ–MTP, 2021 WL 754833, at *3 n.1 (S.D. Miss. Feb. 26, 2021). Nevertheless, the Administration's explanation of the new regulation sheds some light the issue. According to the Administration, it eschewed the treating physician rule because "the healthcare delivery system has changed in significant ways" since 1991 (when the treating physician rule was implemented) insofar as "[m]any individuals receive health care from multiple medical sources, such as from coordinated and managed care organizations, instead of from one treating [physician]." Revision to Rules, 82 Fed. Reg. at 5853. Stated differently, individuals "less frequently develop a sustained relationship with one treating physician" today. *Ibid.* As such, the Administration has found that "the two most important factors for determining the persuasiveness of medical opinions are consistency and supportability" and focusing analysis of those factors "help[s] eliminate confusion about a hierarchy of medical sources and instead focus[es] adjudication more on the persuasiveness of the content of the evidence." *Ibid.*

By contrast, under the old regulations, a treating physician's opinion was given controlling weight and could only be rejected "if the ALJ performs a *detailed analysis* of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton v. Apfel*, 209 F.3d 448, 454 (5th Cir. 2000) (emphasis added). An ALJ's insufficient explanation for departing from that medical opinion was grounds for reversal. *Ibid.* While the new regulations eschewed "hierarchies of medical sources" and are not meant to "make evaluating evidence more difficult," Revision to Rules, 82 Fed. Reg. at 5853, it is clear that an ALJ's sufficient explanation of the supportability and consistency of medical opinions is still a critical portion of the analysis. To be sure, the ALJ is no longer required to undertake a similarly detailed analysis in rejecting a treating physician's medical opinion as persuasive. Cf. *Newton*, 209 F.3d at 454. Therefore, adequate discussion of medical opinion persuasiveness is important.

> Likewise, other courts to address the issue have come to a similar conclusion, but they have been divergent about how exactly to measure the sufficiency of an ALJ's explanation when there is at least some mention of medical opinion persuasiveness. *Compare Harris v. Saul*, No. 19–CV–03715–NRN, 2021 WL 406080, at *2 (D. Colo. Feb. 5, 2021), *with Todd v. Comm'r of Soc. Sec.*, No. 3:20–CV–1374, 2021 WL 2535580, at *9 (N.D. Ohio June 3, 2021), *report and recommendation adopted*, No. 3:20–CV–1374, 2021 WL 2530846 (N.D. Ohio June 21, 2021). Most courts to address the issue appear to require the ALJ to provide a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence, *see, e.g., Ramirez v. Saul*, No. SA–20–CV–00457–ESC, 2021 WL 2269473, at *6 (W.D. Tex. June 3, 2021); *Todd*, 2021 WL 2535580, at *9; *Burba v. Comm'r of Soc. Sec.*, No. 1:19–CV–905, 2020 WL 5792621 (N.D. Ohio Sept. 29, 2020), and do not leave the Court to merely speculate about reasons behind the ALJ's persuasiveness finding or lack thereof, *see, e.g., Moore*, 2021 WL 754833, at *3; *Ramirez*, 2021 WL 2269473, at *6. Stated differently, there must be a discernible "logic bridge" between the evidence and the ALJ's persuasiveness finding. *Ramirez*, 2021 WL 2269473, at *6. Therefore, while the length of explanation need not be profound, *see, e.g., Vaughn v. Comm'r of Soc. Sec.*, No. 20–CV–1119–TMP, 2021 WL 3056108, at *9 (W.D. Tenn. July 20, 2021) (finding detailed three sentence explanation sufficient to be considered an explanation),[4] the ALJ must do more than pay lip service to the regulation without *substantively* engaging with the supportability and consistency of medical opinions in any detail whatsoever, *see, e.g., Howard D. v. Saul*, No. 5:19–CV–01615 (BKS), 2021 WL 1152834, at *12 (N.D.N.Y. Mar. 26, 2021). In other words, the ALJ cannot summarize the entire record and summarily conclude that, in light of that record, one medical opinion is persuasive and the other is not persuasive. *Raymond M. v. Comm'r of Soc. Sec.*, No. 5:19–CV–1313 (ATB), 2021 WL 706645, at *10 (N.D.N.Y. Feb. 22, 2021).

*Pearson v. Comm'r of Soc. Sec.*, 20-cv-166, 2021 WL 3708047, at *4–5 (S.D. Miss. Aug. 11, 2021), *report and recommendation adopted*, 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021).

To begin with, the ALJ summarized—in great detail—the relevant medical evidence in the record. (Tr. 17-26.) The ALJ also acknowledged the relevant medical source opinions in the record. (Tr. 25-26.) Specifically, in her opinion she addressed the medical opinions of the following: 1) Drs. Rowley and Billinghurst, the state agency medical consultants; 2) Dr. Germain and Lev, the state agency psychological consultants; 3) Dr. De Ferreire, the consultative examiner; and 4) Dr. Calvo, one of Plaintiff's treating physicians. (*Id.*) In addition, in accordance with the

new regulations, the ALJ "fully considered the medical opinions and prior administrative medical findings," including the persuasiveness and consistency of the opinions. *See Pearson*, 2021 WL 3708047, at *4 (citing 20 C.F.R. § 404.1520c(b)(2)).

In fact, as to the medical opinions of Drs. Rowley, Billinghurst, Lev, De Ferreire, and Calvo, the ALJ determined that they were partially persuasive and partially unpersuasive.[22]   (Tr. 25-26.)  The only medical source opinion that the ALJ found wholly persuasive was Dr. Germain's. (Tr. 25.)  Specifically, in finding it persuasive, the ALJ found that Dr. Germain's opinion that Plaintiff was "maximally able to understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings" was "persuasive" because it was "consistent with the TTBH mental status examinations that showed her thought/process content was direct goal oriented." (Tr. 25 (citing Tr. 603-31).)  In addition, the ALJ determined that the

---

[22] The ALJ's assessed Plaintiff's mental capacity to perform work-related functions of the RFC as follows:

> The claimant can understand, remember, and carry out instructions and perform tasks with a reasoning, math, and language development level 2; working with objects and data rather than with people; in a goal-oriented setting rather than one that requires a consistent pace be maintained throughout the workday. The claimant can adapt to occasional changes in a routine work environment.

(Tr. 19.)  In assessing Plaintiff's mental RFC, the ALJ appears to have reached her determination by combining multiple medical sources. For example, Plaintiff received mental health treatment in 2013, at which time she was depressed and anxious; however, her thought content and thought process were direct and goal oriented.  (Tr. 526-27.)  Notwithstanding this, her next significant mental health visit did not occur until 2018.  (*See* Tr. 395-98 (referral for mental health issues).) Because of this, the ALJ determined that Plaintiff "can adapt to occasional changes in a routine work environment."  (Tr. 20.)  In addition, Dr. De Ferreire made the following determinations from her examination of Plaintiff, such as: 1) thought process was noted to be coherent, logical, and goal directed; 2) memory skills were intact; 3) concentration was intact; and 4) judgment was intact.  (Tr. 597-99.)  Based on this, the ALJ determined that Plaintiff was able to "understand, remember, and carry out instructions and perform tasks with a reasoning, math, and language development level 2."  (*See* Tr. 21, 25.)

medical opinion was "supported by the evidence cited that showed [Plaintiff's] ability to concentrate and remember information." (Tr. 25 (citing Dr. De Ferreire's consultative examination findings).)

As to Dr. De Ferreire's medical opinion, the ALJ summarized a portion of this visit in the following way:

> Moreover, [Plaintiff's] mental status examination showed that her speech was 100% intelligible and thought process was coherent, logical, and goal directed (Ex. B10F/6). It also showed no current suicidal ideations or hallucinations. The claimant's memory skills were intact, because she was able to name 3 US presidents and recall 4 words after 5 minutes (Ex. B10F/8). She was also able to complete a simple arithmetic problem. Thus, her concentration was intact as well. [Based on this], the undersigned finds that she can understand, remember, and carry out instructions and perform tasks with a reasoning, math, and language development level 2.

(Tr. 21.) As noted, the ALJ's treatment of Dr. De Ferreire's opinion was a mixed bag, as she found it partially persuasive and partially unpersuasive. (Tr. 25.) She determined that Dr. De Ferreire's opinion that Plaintiff "was able to manage benefit payments in her own interest and understand the meaning of filing for benefits" was "persuasive" because it was "supported by her abilities to concentrate and memorize information" during the exam. (*Id.* (citing Tr. 599, 601).) On the other hand, the ALJ determined that Dr. De Ferreire's opinion that Plaintiff "was unable to carry out simple and complex step instructions, if she had to walk, stand, and sit for a long time; socialize; and deal with normal pressures of a competitive work setting" was "unpersuasive" because it was "inconsistent with the TTBH mental status examinations, which showed her symptoms waxed and waned." (Tr. 25 (citing Tr. 599, 603-31).)

Here, the ALJ provided "a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence." *See Pearson*, 2021 WL 3708047, at *5. "Stated differently, there [is] a discernible

'logic bridge' between the evidence and the ALJ's persuasiveness finding." *See Pearson*, 2021 WL 3708047, at *5. Plaintiff takes issue with the ALJ's conclusion that her symptoms have "waxed and waned." (Docket No. 13-1, at 12.) However, the record supports the ALJ's conclusion. For example, the record shows that she has been inconsistent with her mental health treatment. She has refused medications and has stopped and re-started her treatment multiple times.[23] Nevertheless, Plaintiff's treatment plan has been adjusted as needed.[24] In addition, Plaintiff's symptoms have decreased and increased in severity; according to her subjective complaints.[25] Plaintiff has repeatedly presented to TTC in a cooperative manner, exhibiting general positive hygiene, and she reports feeling stable. The medical record also reflects that Plaintiff has struggled with alcohol and chemical dependency,[26] which at times has interfered with her mental health treatment. (*See* Tr. 346 (Plaintiff reported that her manic behavior was due to her drug use).)

For each of Dr. De Ferreire's medical opinion, the ALJ explained how and/or why they were supported and consistent with the record, or how and/or why they were not.[27] (Tr. 25.) "To

---

[23] (*See* Tr. 345, 463, 467, 469, 475, 489, 495, 509, 533, 538, 545, 554, 556, 560, 573, 603, 697, 712, 726, 733, 749, 762, 769, 776 780.) The record also reflects that Plaintiff's presentment to TTC has been sporadic at best. For example, the medical record shows that she failed to receive mental health treatment of any kind from TTC in 2007, 2014, 2015, and 2017. Furthermore, in 2011 and 2016, Plaintiff presented to TTC only one time for treatment in each year.

[24] The record shows that TTC has consistently adjusted Plaintiff's medications as needed and based on her subjective complains. (*See* Tr. 528, 613, 616, 698, 713, 727, 749, 755, 768.)

[25] (*See* Tr. 346, 458, 470, 475, 487, 493, 501, 505, 507, 515, 519, 524, 525, 532, 543, 610, 613, 615, 619-20, 719, 772, 780.)

[26] (*See* Tr. 346, 432, 434, 436, 438, 440, 442, 444, 446, 448, 450, 452, 454, 456, 459, 463, 465, 469, 471, 475, 482, 485, 496, 510, 520, 555, 566, 697, 712, 726, 739, 749, 759, 777.)

[27] Furthermore, the ALJ is required to discuss the evidence but "is not always required to do an exhaustive point-by-point discussion." *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

be sure, the ALJ is no longer required to undertake a [ ] detailed analysis in rejecting a treating physician's medical opinion as persuasive." *Pearson*, 2021 WL 3708047, at *5. Furthermore, "the length of explanation need not be profound." *Id.* In any event, the ALJ's summary of the relevant medical evince and her explanation of her treatment of the medical source opinions—including Dr. De Ferreire's—was not cursory, in fact, far from it. Stated another way, the ALJ's treatment of the persuasiveness—or lack thereof—of Dr. De Ferreire's medical opinion is supported by substantial evidence.[28]

"The Commissioner, rather than the courts, must resolve conflicts in the evidence."[29] *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). In resolving the conflicts in the medical evidence of record, the ALJ did "not leave the Court to merely speculate about reasons behind her persuasiveness finding or lack thereof." *Pearson*, 2021 WL 3708047, at *5. Rather, her reasoning provided a "'logic bridge' between the evidence and her persuasiveness finding" as to Dr. De Ferreire's opinion. *Id.* More importantly, the ALJ's persuasiveness findings are supported by substantial evidence in the record, and Plaintiff's claim to the contrary should be rejected.

### III. CONCLUSION

For the foregoing reasons, the undersigned recommends that Plaintiff's Motion for Summary Judgment (Docket No. 13) be DENIED, that Defendant's Motion for Summary

---

[28] However, it bears repeating that the issue is not whether the Court would reach the same conclusion as did the ALJ. *Johnson*, 864 F.2d at 343 ("we may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute our judgment for that of the Secretary, even if the evidence preponderates against the Secretary's decision").

[29] Furthermore, "the ALJ has sole responsibility for determining a claimant's disability status," and "the ALJ is free to reject the opinion of *any* physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)) (emphasis added). "[T]he ALJ 'is entitled to determine the credibility of *medical experts* as well as lay witnesses and weigh their opinions accordingly.'" *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485) (5th Cir. 1994) (emphasis added)).

Judgment (Docket No. 16) be GRANTED, that the Commissioner's decision be AFFIRMED, and that this action be DISMISSED.

Due to the detailed medical information summarized in this report, it is **ORDERED** that the Clerk shall file this Report and Recommendation under **SEAL**.

## <u>NOTICE TO THE PARTIES</u>

The Clerk shall send copies of this Report and Recommendation to the parties who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on September 12, 2022.

Nadia S. Medrano
UNITED STATES MAGISTRATE JUDGE